IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 2:22-cr-123 |
| JAMIQUE MAYS, | |
| A/K/A/ "EYE TUNES," | |
| Defendant. | |

## GOVERNMENT'S TRIAL MEMORANDUM

The United States of America, by and through the undersigned counsel, hereby submits this trial memorandum discussing certain evidence that the government intends to introduce in its case-in-chief.

## ANTICIPATED TESTIMONY AND EVIDENCE

*Robbery Victim*

M.S. will testify about the robbery that the defendant is alleged to have committed on the night of October 9, 2017. M.S. was, at the time, employed by Mac's Reloads, a small ammunition reloading business owned by T.M. (since deceased). T.M. operated Mac's Reloads out of his home in Virginia Beach, Virginia. M.S. will testify that, on the night of October 9, 2017, she and T.M. traveled back from a gun show in Philadelphia, Pennsylvania to T.M.'s home to drop off supplies from the gun show. They arrived in Virginia Beach at approximately three o'clock in the morning. As they were unloading the truck full of gun show supplies, two men dressed all in black, including black gloves and ski masks, ran up on them, pointed firearms at them, and demanded to know where "the black bag" was. M.S. will testify that the black bag in question was a duffel bag that T.M. would use to carry cash from the gun shows as well as personal effects, receipts, and other

items.  M.S. will describe how one of the robbers pointed a gun to her head and threatened to kill her as he demanded to know the location of the black bag.  She will further describe how the robbery progressed, as one robber went inside T.M.'s house to retrieve the black bag and the other ordered the two victims off the truck.  Both robbers then marched the victims to the backyard and ordered them to lay face-down on the ground while they fled the scene.

M.S. will provide descriptions of the two robbers.  She will testify that they were both men and will distinguish them by skin tone, height, and build.  The taller robber was a darker-skinned African American man about 6'0 tall with a slim, athletic build.  The shorter robber was a light-skinned African-American man about 5'8-5'9 tall with a stocky build.  These descriptions will match the appearances of the defendant and Desmond Littlejohn, the defendant's partner in a music group and previously convicted co-conspirator in the robbery.

M.S. will establish that Mac's Reloads was a business operating in interstate commerce.  She will further provide an estimate of the currency stolen that night.  Lastly, M.S. will authenticate items of physical and documentary evidence and put these items in context.  She will testify regarding two videos taken from surveillance footage outside T.M.'s house.  These videos show the robbery as it occurred.  She will testify regarding items that were recovered by Virginia Beach Police Department in the minutes and hours following the robbery, to include: business paperwork, identification badges, a roll of Brother Tape adhesive, a black ski mask, two cash bags, photographs of T.M.'s black duffel bag and its contents, and a photo of T.M.'s personal firearm.  The items M.S. will authenticate are: Government Exhibits: 1A, 1B, 1C, 3A, 3B, 3C, 4A, 4C, 5, 6D, 8, 10, 10A, 10B, 9D, 9F, and 9G.

*Law Enforcement Witnesses*

The government intends to call two officers from the Virginia Beach Police Department: Officer Justin Golia and Officer Scott Romansky. These officers will testify that they reported to the scene of the robbery at Mac's Reloads, which is located in the 1600 Block of Kilt Street in Virginia Beach, Virginia, shortly after the robbery occurred. These officers were not the first to arrive. Other officer had already arrived on scene and were engaging with the robbery victims. Officers Golia and Romansky spread out throughout the surrounding streets to look for evidence and leads. They each found several items of physical evidence that had been discarded by the robbers. Officer Golia found T.M.'s black duffel bag, containing personal items and a firearm, as well as one of two cash bags. Officer Romansky found a discarded black ski mask and a second cash bag. Both officers will testify that they stayed with these items until an evidence technician with the Virginia Beach Police Department arrived to take possession of them. The offers will authenticate the items they found as well as photographs of the locations where they were found. Officer Golia will authenticate Government Exhibits: 2, 9A, 9B, 9C, and 9E. Officer Romansky will authenticate Government Exhibits: 6A, 6B, 6C, 6E, 6F, and 7.

The government does not intend to call the Forensic Technician from the Virginia Beach Police Department who secured the items of physical evidence that were discarded on the streets. These items were maintained in the custody of the Virginia Beach Police Department until Agents with the Bureau of Alcohol, Tobacco, Firearms, and Explosives took possession of them. Pursuant to the Court's ruling on the government's motion to pre-admit evidence, the government understands that it is sufficient to establish authenticity if one or more witnesses can adequately testify to support a finding that the evidence in question is what the proponent claims it to be. Fed. R. Evid. 901(a); ECF Nos. 80, 88. The government will establish the authenticity of the physical

3

evidence through the civilian witnesses who are personally familiar with those items, as well as the officers who found the items on the night of the robbery.

The government will also call Detective Jennifer MacArthur Evans from the Virginia Beach Police Department.  Detective Evans managed and led the investigation into the robbery. She took DNA samples from one of the defendant's co-conspirators, Desmond Littlejohn, pursuant to a search warrant.  She will testify for the limited purpose of establishing that she took buccal swab samples from Mr. Littlejohn pursuant to a state search warrant and then provided those buccal swabs to the Virginia Department of Forensic Science, Eastern Laboratory, for examination. Detective Evans will authenticate Government Exhibits 11 and 11A.

*Cooperating Witness*

It is anticipated that a cooperating witness will testify about the conspiracy to commit robbery and commission of the robbery, as well as the defendant's unlawful possession of a firearm.  She will testify that she had an ongoing business and social relationship with Mays and Littlejohn associated with their Eye Tunes Nation music group, as well as an intimate relationship with Mays.   Both she and Mays were struggling financially in the Fall of 2017.   She was, at the time, an employee of Mac's Reloads and would travel to gun shows on behalf of the business. Mays would accompany her to the gun shows, assist with loading and unloading supplies, and be present as she handled the proceeds from the show.   She will testify that Mays, after seeing the money, commented, in sum and substance, "that's a lick," which she took to understand that he saw the money from the gun show as an opportunity.   The witness is expected to testify that at one of these gun shows, which took place in Richmond on August 27, 2017, she purchased a

firearm for Mays at his request despite the fact that he had told her that he was a convicted felon prohibited from possessing a firearm.   She will state that she thereafter saw Mays possess and carry this weapon routinely, and that he held it with his left hand.

It is anticipated that the witness will further testify that she, Mays, and Littlejohn came to an agreement to rob Mac's Reloads after a larger gun show because that was likely to be more profitable.  They prepared for the robbery by assigning roles, scoping out the neighborhood, and purchasing ski masks from Target.  The robbery was initially supposed to take place the first weekend of October 2017, after a gun show in Chantilly, Virginia, but was moved to the second weekend of October after things seemed amiss to the cooperating witness on the night of the planned robbery.

The witness will testify to the events of the night the robbery occurred.  She will describe how the co-conspirators drove two cars to a shopping center near Mac's Reloads, where they parked Littlejohn's car.   She then drove Mays and Littlejohn to an area close to Mac's Reloads and dropped them off.  She saw them walk away wearing black clothing, black gloves, black ski masks, and carrying firearms.  Mays was carrying the specific firearm she had purchased for him in August of 2017.  She then waited for the large truck belonging to Mac's Reloads to arrive. When she saw the truck turn the corner, she called Mays, sending him a signal to begin the robbery. She then drove several blocks to a designated meeting place, where she picked up Mays and Littlejohn.  Mays carried T.M.'s black duffel bag with him.   At her direction, Mays removed the cash from cash bags within the duffel bag and then threw the duffel bag, the cash bags, and the remaining personal items out of the car window as she drove away.   He did so because she told him that the cash bags had GPS trackers in them.  The witness will testify that the three co-

conspirators then cleaned her car and traveled to Littlejohn's house.  Once there, they split up the cash proceeds from the robbery.  She will state that she stayed in a romantic relationship with Mays for over two years after the robbery occurred, but ultimately agreed to cooperate with the government once she was arrested and incarcerated.

This cooperating witness will authenticate items of physical, documentary, and electronic evidence.  She will identify images taken from social media and email accounts associated with the co-conspirators, showing their relationship and communications in the months leading up to the robbery.  She will identify an ATF Form 4473, documenting her purchase of a firearm on August 27, 2017, several days before Mays' birthday.  She will identify photographs and physical evidence associated with Mac's Reloads participation in gun shows.   She will confirm that the cash bank bags in physical evidence are accurate to what they looked like at the time of the robbery.  She will identify a map of the neighborhood surrounding Mac's Reloads and testify to the specific locations involved in the commission of the robbery.  The cooperating witness will authenticate Government Exhibits: 12A, 12B, 12E, 14F, 14G, 19, 12C, 12D, 14H, 8, and 15A.

*Other Civilian Witnesses*

The government intends to call two additional civilian witnesses.  The first of these witnesses is K.G., an employee of Mac's Reloads, who will corroborate the testimony of both the robbery victim, M.S., and the cooperating witness.  K.G. will testify about the business's procedures for handling cash after gun shows, inside knowledge of business practices that would have been known to the cooperating witness, and her knowledge of the relationship between the cooperating witness and Mays.  The other civilian witness, J.C.D., is an acquaintance of Mays who will authenticate a series of Facebook messages between herself and Mays that occurred in

November 2017, a month after the robbery, and in which Mays tells her that he committed a robbery while his face was covered and that he used his own gun during the robbery.   This witness will authenticate Government Exhibits 16A through 16D.

*Expert Witnesses*

The government intends to call up to three expert witnesses.  One will be Special Agent Alexander Martinez, ATF, who will testify that the firearm Mays possessed and used in the robbery was produced and transported in interstate commerce.   Another will be Special Agent Nicholas Ivone, ATF, who will testify to investigative techniques that led to the identifying of certain relevant electronic evidence from Google, Inc. and Meta, Inc. in this case.   The government will offer portions of this electronic evidence into evidence, authenticated through a combination of certifying affidavits and witness testimony.  Special Agent Ivone will authenticate Government Exhibits: 14A through 14N.  The government's third expert witness will be Brittany Porter, a Forensic Biologist employed by the Virginia Department of Forensic Science, who performed the DNA analysis on the ski mask recovered from the scene of the robbery and compared it with samples of Littlejohn's DNA.  She will testify to the analysis she performed and authenticate three certificates of analysis.   Government Exhibits 11 and 13A through 13C.  The government has previously provided the defense with expert witness notification pursuant to the Court's scheduling order.

*Defendant's Certified Convictions*

In keeping with the Court's ruling at the December 1, 2023 motions hearing, and absent a stipulation from the defendant, the government will present evidence of the defendant's certified convictions, including that he was previously convicted of robbery, conspiracy to commit robbery, and use of a firearm in the commission of a felony.  ECF No. 103.

## ANTICIPATED EVIDENTIARY MATTERS

### A.  Defendant's Statements and Federal Rule of Evidence 404

The parties previously litigated the admissibility of certain evidence pursuant to Federal Rule of Evidence 404(b).  ECF Nos. 31, 39, 56, 96, 103.  Pursuant to those previous filings and rulings, the government intends to offer into evidence several statements the defendant made to law enforcement and several statements he made to witnesses while incarcerated.  The government will also elicit testimony and offer evidence regarding inculpatory statements the defendant made prior to the conspiracy, during the conspiracy, and after the conspiracy.  Such statements are admissions of a party opponent and are therefore excluded from the definition of hearsay under Federal Rule of Evidence 801(d)(2)(A) (excluding from the hearsay definition "offered against an opposing party" and "made by the party in an individual or representative capacity").  Further, when testimony relates to conversations with the defendant, the government may seek to introduce statements of the person with whom the defendant was speaking in order "to place [the defendant's] responses into context," *United States v. Wills*, 346 F.3d 476, 490 (4th Cir. 2003) (holding that a pro se defendant's recorded jail calls with his brother in which the defendant made inculpatory statements were admissible in their entirety), and to make the defendant's statements "intelligible to the jury and recognizable as admissions," *id.* (quoting *United States v. Lemonakis*,

485 F.2d 941, 948 (D.C. Cir. 1973)).  In addition to or instead of offering these statements during its case-in-chief, the government may use such statements outside of its case-in-chief, such as for impeachment purposes on cross-examination.  *See Michigan v. Harvey*, 494 U.S. 344 (1990); *Oregon v. Elstad*, 470 U.S. 298, 307 (1985); *Harris v. New York*, 401 U.S. 222, 225–26 (1971) ("The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances.").

Depending on the defendant's theory of the case and presentation of evidence, the government may offer recordings of statements the defendant made to law enforcement on two separate occasions.  The government may also offer recordings of phone calls the defendant made to other witnesses while incarcerated.  When the defendant was represented by counsel, the government had discussed these matters with defense counsel and reached stipulations regarding the defendant's prior convictions and relationships with witnesses, specifically his status as a convicted felon and his relationship with Desmond Littlejohn, that would have obviated the need to introduce some of these matters.

The government agreed to these stipulations because, in these statements, the defendant makes references to prior convictions, including a prior felony robbery conviction, and prior periods of incarceration, including a period of incarceration where he met Littlejohn.  The government recognized that these statements could, under some circumstances, be considered evidence of the defendant's character.  Federal Rule of Evidence 404(b) prohibits introduction of evidence of a person's character or character trait to prove that on a particular occasion the person acted in accordance with that character or trait.  The Rule recognizes certain exceptions, such as that when a defendant in a criminal case offers evidence of a pertinent trait, the government may

9

offer evidence to rebut it.  The government may also offer evidence of a person's prior crime, wrong, or act for a purpose other than proving character, such as to prove: "motive, opportunity, intent, preparation, plan, knowledge, identify, absence of mistake, or lack of accident."  Federal Rule of Evidence 404(b).  The government recognized that matters referenced in the defendant's statements, including references to prior convictions and to prior incarceration, could be considered improper character evidence within the meaning of Federal Rule of Evidence 404(b) and would have the potential to be unduly prejudicial to the defendant.  In an attempt to streamline the presentation of evidence and protect the trial record, the government had agreed to avoid introducing these matters.

The government has no indication at this point that the defendant, while representing himself, will agree to these or similar stipulations.  The Court has set a deadline of December 8, 2023 for the defendant to notify the government as to whether or not he will agree to any stipulations.  ECF No. 103.  The government recognizes the possibility that the defendant may open the door to these matters.  The government anticipates that the defendant's presentation of evidence may put these matters into controversy.  For example, the defendant may attempt to minimize the relationship he had with Desmond Littlejohn in an attempt to distance himself from his co-conspirators.   If he suggests or testifies that he did not know Littlejohn well, he may open the door to evidence that he was previously incarcerated with Littlejohn.  If he does so, some or all of these matters will cease to be impermissible character evidence and will instead become proper impeachment evidence, at which point the government will seek their introduction.

## B.  Statements of Co-Conspirators

Federal Rule of Evidence 801(d)(2)(A) provides that a statement is not hearsay if it is offered against an opposing party and was made by the party in an individual or representative capacity.   As noted, the government intends to offer numerous statements made by the defendant leading up to, during, and after the robbery as well as during his time in incarceration.   In addition to the defendant's own statements, Federal Rule of Evidence 801(d)(2)(E) provides that a statement is not hearsay if it "was made by the party's co-conspirator during and in furtherance of the conspiracy."  The government anticipates that a cooperating witness will testify extensively to statements that she, Mays, and Littlejohn made during and in furtherance of the conspiracy.   These will include an email message that Littlejohn sent to her several days before the robbery was initially set to take place in Chantilly, Virginia during the first week of October 2017, wherein he states, in part "let me know if yall still down for that show Sunday."  Government Exhibit 15A. The government will establish through the witnesses' testimony that this statement was in relation to the conspiracy.  The government will also offer email chains between the cooperating witness, Mays, and Littlejohn pertaining to their music group.  These statements will be offered to establish their relationship during the timeframe of the conspiracy.

## C.  Witness Privacy and Dignity Issues

The government seeks to take this opportunity to highlight certain issues that may arise during the defendant's examination of witnesses.  Federal Rule of Evidence 611(a) provides that the Court should exercise reasonable control over the mode and order of examining witnesses to: "make those procedures effective for determining the truth, avoid wasting time, and protect

witnesses from harassment or embarrassment."  Subject matter on cross-examination should not go beyond the subject matter of the direct examination and those matters impacting a witnesses' credibility.  Federal Rule of Evidence 611(b).  The government's witnesses include two prior intimate partners of the defendant.  In addition to and separate from those intimate partners, the government will be calling one of the victims of the robbery to testify.  All three of these witnesses are likely to experience some level of trauma and emotion when being cross-examined by the defendant, with whom they either had a personal intimate relationship or by whom they were victimized.  The government asks that the Court be mindful in limiting the defendant's cross-examination of these witnesses to matters that are directly relevant, within the scope of direct examination, or narrowly tailored to impeach the witness' credibility in a permissible manner under the Federal Rules of Evidence.

Specifically, one of the government's witnesses, J.C.D., presents a risk for undue harassment or embarrassment.  J.C.D.'s purpose in testifying will be to authenticate a series of inculpatory statements the defendant made to her in a Facebook messenger conversation a month after the robbery.  J.C.D. was born a biological male, and over the past several years transitioned to being a female. J.C.D. uses the pronouns "she/her."  When J.C.D. met the defendant in or about 2017, she identified as a male, utilized her legal name, and utilized the pronouns he/him.  The government's intent is to briefly address this transition at the beginning of its direct examination of the witness by asking the witness to state her legal name and then state her preferred name and preferred pronouns.  The government will then address the witness by her preferred name throughout the remainder of the examination.

12

The government seeks to minimize any embarrassment to this witness.  The government does not intend to elicit testimony regarding the witness' intimate relationship with the defendant which occurred when the witness was a biological male.  However, if the defendant puts their relationship in controversy by denying he knows the witness, denying he communicated with her through Facebook messenger, or denying he was the individual who sent the messages to her, the government may elicit evidence, through testimony or additional Facebook messages, establishing the scope and depth of their relationship.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:  _____/s/_____
Kristin G. Bird
Assistant United States Attorney
Alyssa K. Miller
Special Assistant United States Attorney
Attorneys for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, VA 23510
Office Number - 757-441-6331
Facsimile Number - 757-441-6689
E-Mail Address – kristin.bird@usdoj.gov
                alyssa.miller@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of December, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following to all counsel of record.

I FURTHER HEREBY CERTIFY that on this 11th day of December, 2023, a copy of the foregoing was mailed to the defendant at Western Tidewater Regional Jail, P.O. Box 247, 2402 Godwin Boulevard, Suffolk, Virginia, 23434.

/s/ Alyssa K. Miller
Alyssa K. Miller
Special Assistant United States Attorney
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, VA 23510
Phone: 757-441-6331
Fax: 757-441-6689
Email: alyssa.miller@usdoj.gov